IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MARVIN L. BARBER, )
 )
        Plaintiff, )
 ) Case No. 12-CV-239-JED-PJC
v. )
 )
JEFF M. HENDERSON, WILLIAM A. )
YELTON, RON PALMER, and THE )
CITY OF TULSA, )
 )
        Defendants. )

## OPINION AND ORDER

Plaintiff asserts claims against the defendants pursuant to 42 U.S.C. §§ 1983 and 1985 and *Okla. Stat.* tit. 51, § 154(B)(2)(e)(2), based upon allegations that his civil rights were violated by an unconstitutional search and seizure, wrongful conviction, and unlawful imprisonment for over five years. The three individual defendants are sued in both their individual and official capacities. Defendants Ron Palmer and the City of Tulsa move to dismiss the plaintiff's Complaint in this case.[1]

### I. Background

At the pleading stage, the Court accepts the following facts, which are alleged in the plaintiff's Complaint, as true. In 2004, plaintiff was convicted of federal drug and firearm charges. According to the Complaint, those convictions arose out of service of a "John Doe Black Male" search warrant that was obtained by defendant Yelton, who was an officer of the Tulsa Police Department (TPD). The warrant was allegedly premised upon false and misleading information in the affidavit supporting the search warrant. (Doc. 2 at 11-15). The arrest of plaintiff occurred on November 30, 2004, at the home of Montenae Foreman, a black female in

---

[1] Defendants Henderson and Yelton have filed answers.

north Tulsa. Ms. Foreman was en route to the home, and her uncle, Roman Checotah, who was then residing at her home, was present while plaintiff awaited Ms. Foreman's arrival. (*Id.* at ¶¶ 27-29). Yelton and his fellow officer, defendant Henderson, entered Ms. Foreman's home "under the auspices of" the "John Doe Black Male" search warrant at approximately 10:00 p.m. (*Id.* at ¶¶ 30-32).

During a search of Ms. Foreman's residence, cocaine base, marijuana, and scales were allegedly found in the room that had been occupied by Mr. Checotah, and a .45 caliber weapon was allegedly found inside the toilet bowl in a bathroom. Plaintiff and Checotah were arrested and charged with various state offenses in Tulsa County District Court. Those charges were later dismissed by the state, but plaintiff was prosecuted in federal court on federal charges. (*Id.* at ¶¶ 36-40). Plaintiff was convicted on the federal charges, was sentenced to 150 months for each of two counts, to be served concurrently, and 60 months on a third count, to be served consecutively to the 150 months, and was assessed fines and costs. (*Id.* at ¶¶ 42-44).

Plaintiff's federal criminal conviction "rested entirely on the falsified testimony and fraudulent actions of Defendants Henderson and Yelton," which included obtaining the "John Doe Black Male" warrant upon false information in the supporting warrant affidavit. In addition, Yelton and Henderson intentionally omitted from reports and testimony that Mr. Checotah had stated to the officers that the drugs and firearm belonged to Checotah, not plaintiff, and the officers provided "[i]ntentionally false and misleading testimony" at trial that (1) plaintiff had confessed that the drugs and firearm belonged to plaintiff, (2) plaintiff was in the area of the bathroom where the firearm was allegedly found in a toilet, and (3) the officers observed that plaintiff's hands were wet when the officers entered the home. (*Id.* at 45). Plaintiff spent over

five and one-half years in prison before this District Court (Judge Terence Kern presiding) vacated his conviction in August, 2010. (*Id.* at ¶ 46-47).

To support his claims of municipal liability and supervisory liability, plaintiff alleges that the City, through its police officers, frequently used "John Doe Black Male" search warrants, which contained boilerplate language and false and misleading fact allegations, where probable cause did not in fact exist. (*Id.* at ¶ 16). The TPD engaged in a "persistent practice, evidenced by a pattern of tortious conduct which is so widespread and well-established as to constitute a custom or usage with the force of law, i.e. a policy of the municipality, Defendant City of Tulsa." (*Id.* at ¶ 23). The TPD was "at ease with routinely violating the constitutional rights of the citizenry," as evidenced by the "apparent comfort and impunity with which a substantial number of City of Tulsa police officers committed acts constituting crimes and civil rights violations." (*Id.* at ¶ 22). The plaintiff recites numerous incidents which were charged in federal criminal indictments against Yelton and Henderson and others relating to acts between 2005 and 2009. (*See id.* at ¶¶ 14-21). Plaintiff alleges that, although the charged examples occurred from and after 2005 (after plaintiff's arrest in 2004), the charged acts were merely continuations and further examples of widespread Tulsa police practices which existed before the time plaintiff was arrested, and at least 43 individuals, including plaintiff, had felony convictions overturned as a result of the Tulsa police corruption. (*See id.* at ¶¶ 13, 16, 17, 20).

Plaintiff alleges upon information and belief that, in defendant Palmer's (former) role as TPD Chief of Police and as the supervisor of TPD officers in 2004, Palmer "permitted specific individuals connected with [Yelton, Henderson, and other police officers] to be assigned to the Tulsa Police Department [Internal Affairs Division] in order to thwart or otherwise derail citizen complaints concerning the actions of [those officers]." (*Id.* at ¶ 24). Further, "the volume,

severity, pervasiveness, and continuity of the acts constituting civil rights violations on the part of numerous officers of the [TPD], which were committed against a not insignificant number of citizens, and which were uncovered by an outside entity pursuant to its own inquiry, evinced an investigation on the part of Chief Ron Palmer that was so inadequate as to constitute ratification of the constitutional violations by the final policymaker, Defendant Palmer, thereby rising to the level of a policy / custom / practice / usage on the part of the City of Tulsa." (*Id.* at ¶ 25).

## II. Dismissal Standards

In considering a Rule 12(b)(6) dismissal motion, a court must determine whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The Rules require "a short and plain statement of the claim to show that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard does "not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555-56, 570 (citations omitted). "Asking for plausible grounds ... does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 562.

*Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). For the purpose of making the dismissal determination, a court must

accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to the claimant. *See Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

## III. Discussion

### A. Allegations of Policy or Custom

The City and Palmer argue that the plaintiff's Complaint is so lacking in facts supporting his allegations of the existence of a policy or custom that the Complaint fails, as a matter of law, to state any claim for relief. A municipality or county may not be held liable under § 1983 solely because its employees inflicted injury; municipal liability cannot be found by application of the theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

To establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original). "Official municipal policy

includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. These are 'actions for which the municipality is actually responsible.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

The Tenth Circuit has described several types of actions that may constitute a municipal policy or custom.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Plaintiff has clearly alleged that (1) he was wrongfully arrested based upon false and misleading information provided in a search warrant affidavit, (2) the search warrant was a "John Doe Black Male" search warrant, void of probable cause, (3) the TPD had a practice of obtaining the John Doe Black Male warrants based upon inaccurate information, (4) plaintiff was arrested and convicted based upon the false information in the affidavit and false testimony of Yelton and Henderson, (5) the TPD officers, including Yelton and Henderson, were permitted to violate citizens' civil rights with such impunity over such a long period of time as to constitute a widespread practice on behalf of the TPD, (6) then-Chief Palmer failed to supervise and discipline, and ratified the conduct of, the officers alleged to be corrupt, (7) Palmer was involved in approval of Internal Affairs Division personnel in order to thwart or otherwise derail citizen complaints concerning the actions of officers who routinely violated citizens' civil rights, (8) the

6

defendants' actions were deliberately indifferent to the clearly established rights of plaintiff to be free from unreasonable search and seizure, (9) the unconstitutional actions of the defendants resulted in numerous felony convictions of dozens of citizens, one of which was plaintiff, over several years' time, and (10) as a result of the defendants' acts, plaintiff spent over five years in prison. At the pleading stage, these allegations are sufficient to state a plausible claim for municipal liability based upon theories of informal custom, ratification, and / or a failure to supervise and train accompanied by deliberate indifference to the plaintiff's civil rights. *See Bryson*, 627 F.3d at 788.

In support of its argument that the plaintiff has not adequately asserted facts that would establish that the City was on notice of any pattern of constitutional violations, the City cites a decision in *Haley v. City of Tulsa*, Case No. 10-CV-36-TDL-FHM (N.D. Okla.) in which the Honorable Tim Leonard granted an unopposed motion for summary judgment by the City of Tulsa. As noted by the City, Mr. Haley's claims were based upon alleged violations of his rights, dating back to 2005. Subsequent to Judge Leonard's Order referenced by the City, Mr. Haley moved to vacate the grant of summary judgment to the City, and Judge Leonard did vacate the earlier order and permitted Mr. Haley to file a summary judgment response out of time. (*Haley*, Doc. 108). Thereafter, considering the record in opposition to the summary judgment motion, Judge Leonard *denied* the City's motion for summary judgment on Mr. Haley's malicious prosecution claim. (*Id.*, Doc. 125). Rejecting the City's argument that there was no evidence of notice of a pattern of constitutional violations, Judge Leonard noted that plaintiff had provided evidence of 29 complaints against Henderson, some of which were in 2004. (*Id.*, Doc. 125 at 10-13). Based on that record, which included complaints that Henderson lied to obtain search warrants, Judge Leonard "conclude[d] plaintiff has presented sufficient evidence to create

7

a jury question as to whether the City was on notice of potential constitutional violations by Henderson and other police officers prior to plaintiff's arrest and Henderson's subsequent alleged perjury." (*Id.* at 12). The now-vacated summary judgment decision cited by the City clearly does not support its argument. In any event, as noted above, the Court concludes that plaintiff has sufficiently alleged facts stating a plausible municipal liability claim, which is all that is required at the pleading stage.

B. Timeliness of Fourth Amendment Claim

The City and Palmer argue that plaintiff's first cause of action, alleging a § 1983 claim for violation of his Fourth Amendment rights, is time-barred. "A hodgepodge of state and federal law governs the timeliness of claims" under § 1983. *Mondragón v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). "The statute of limitations is drawn from the personal-injury statute of the state in which the federal district court sits." *Id.* Federal law "determines the date on which the claim accrues and the limitations period starts to run." *Id.* State law governs tolling, although federal law may allow additional equitable tolling in rare circumstances. *Id.* In this case, plaintiff's § 1983 claims are governed by a two-year statute of limitations, as Oklahoma provides a two-year limitations period for personal injury actions. *Okla. Stat.* tit. 12, § 95(A)(3); *Price v. Philpot*, 420 F.3d 1158, 1162 (10th Cir. 2005).

"[A] plaintiff who claims that the government has unconstitutionally imprisoned him has at least two potential constitutional claims." *Mondragón*, 519 F.3d at 1082. One arises under the Fourth Amendment, and the other arises under the Due Process Clause of the Fourteenth Amendment. *Id.* The Tenth Circuit has explained certain accrual differences between Fourth Amendment and Fourteenth Amendment claims of unconstitutional imprisonment, as follows.

> In summary, two claims arise from an allegedly unconstitutional imprisonment as analysis "shifts" from the Fourth Amendment to the Due Process Clause. The

> period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment. That claim accrues when the plaintiff is released or legal process is instituted justifying that imprisonment. The period of time between the institution of that process and its favorable termination – through acquittal, habeas corpus, voluntary dismissal, etc. – forms a second claim, arising under the Due Process Clause. That claim accrues, at the earliest, when favorable termination occurs.

*Id.* at 1083 (citation omitted). For purposes of accrual of a plaintiff's Fourth Amendment unlawful arrest claim, "legal process" is instituted "when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091, 1096 (2007)). Accordingly, for purposes of plaintiff's Fourth Amendment claim for false arrest, the statute of limitations began to run, at the latest, on January 6, 2005, when plaintiff was arraigned on the federal charges. The two year statute of limitations accordingly ran two years later in 2007, and plaintiff's Fourth Amendment claim for unlawful arrest is time-barred, as this lawsuit was not initiated until 2012.

Defendants do not dispute the timeliness of plaintiff's unlawful arrest claim under the Due Process Clause, which is asserted as plaintiff's Second Cause of Action. Under the principles set forth in *Mondragón*, that due process claim "accrue[d], at the earliest, when favorable termination occur[red]." *Id.* The Complaint alleges that plaintiff was released from prison on August 10, 2010 pursuant to an order by Judge Kern. The due process claim for unlawful imprisonment accrued at that time, and plaintiff filed this action within two years thereafter.

Plaintiff's First Cause of Action for unlawful arrest under the Fourth Amendment is dismissed, as that claim is time-barred. However, the unlawful imprisonment claim under the Fourteenth Amendment Due Process Clause, as set forth in plaintiff's Second Cause of Action, is timely and will not be dismissed.

9

### C. Claim under § 1985

The City and Palmer argue that plaintiff's Third Cause of Action should be dismissed, on two grounds. First, they assert that plaintiff has not sufficiently alleged a racial or class-based discriminatory animus as is required for a claim under § 1985(3). The applicable statute creates a damages cause of action against persons who conspire to deprive a person or class of persons of "the equal protection of the laws, or of equal privileges and immunities under the laws...." 42 U.S.C. § 1985(3); *see Bisbee v. Bey*, 39 F.3d 1096, 1101-02 (10th Cir. 1994). "A violation of section 1985 must include class-based or racially discriminatory animus." *Bisbee*, 39 F.3d at 1102. "While more than mere conclusory allegations are required to state a valid claim, the nature of conspiracies often makes it impossible to provide details at the pleading stage and ... the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint." *Hogan v. Winder*, __ F.3d __, __, 2014 WL 3827603, *12 (10th Cir. Aug. 5, 2014) (quoting *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994)). Still, "in the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." *Bisbee*, 39 F.3d at 1102 (quoting *Campbell v. Amax Coal Co.*, 510 F.2d 701, 702 (10th Cir. 1979)); *see Hogan*, at *12 (affirming dismissal of § 1985(2) claim where facts did not allege agreement with requisite intent to do the act prohibited by the statute).

Plaintiff asserts that he has satisfied the animus requirement because the Complaint includes specific factual allegations from which it may be inferred that the actions against him were motivated, at least in part, by racial animus. The Complaint alleges that a "John Doe Black Male" search warrant, premised upon false and misleading facts alleged in the underlying affidavits, was served upon the home of a black person. (*See* Doc. 2 at ¶¶ 16, 27, 31). Plaintiff, a black man, was arrested at the time of the service of that warrant on the home, and he alleges

that the use of John Doe Black Male warrants, which lacked probable cause and were based upon fraudulent and false information, was a common, routine practice by the TPD. (*Id.* at ¶¶ 31, 32, 45.a, 52). Plaintiff also alleges in his response that, because plaintiff and "a large majority" of others who were subjected to defendants' conduct were "racial or ethnic minorities, racial animus was made a rather glaring part" of the Complaint. (Doc. 22 at 16). Plaintiff also alleges that Palmer was involved in the conspiracy, because he acted to thwart or otherwise derail citizen complaints about the officers' actions. (*See* Doc. 22 at 16-17). At the pleading stage, the plaintiff has provided enough facts to state a plausible claim under § 1985(3).

The City and Palmer also argue that plaintiff's § 1985(3) claim should be dismissed based upon the intracorporate conspiracy doctrine. The doctrine, which was first developed in the antitrust context and subsequently applied to certain other civil conspiracies, generally provides that a corporate entity cannot conspire with its own agents. *Brever*, 40 F.3d at 1126. In support of its argument for the application of the doctrine to plaintiff's § 1985(3) claim, the City cites authorities outside of this Circuit. (*See* Doc. 16 at 9). It appears that most Circuit Courts of Appeals to have decided the issue have applied the doctrine in the context of § 1985(3) claims. *See, e.g., Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 768-69, n.9 (11th Cir. 2000) (citing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Circuits as "hav[ing] applied the intracorporate conspiracy doctrine to bar § 1985(3) claims against defendants for interference with civil rights and held that agents acting on behalf of a single legal entity normally cannot conspire with themselves or with the entity").

Notwithstanding the decisions of a majority of Circuits, this Court must follow the precedent of the Tenth Circuit. *United States v. Spedalieri*, 910 F.2d 707, 709, n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views

concerning the advantages of the precedent of our sister circuits"). The Tenth Circuit has *declined to apply the intracorporate conspiracy doctrine in the civil rights context* and reversed a district court's dismissal of a claim under 42 U.S.C. § 1985(2), which provides a cause of action for a conspiracy to deter a party or witness from testifying. *See Brever*, 40 F.3d at 1126-27.

> We have yet to determine whether the doctrine precludes intracorporate conspiracies in civil rights actions. A majority of other circuits have addressed the issue with divergent results. Five circuits have extended the intracorporate conspiracy doctrine to actions under sections 1983 and 1985, while four others have severely limited or questioned the applicability of the doctrine in the civil rights context. *We agree with the latter group of courts that the doctrine*, designed to allow one corporation to take actions that two corporations could not agree to do, *should not be construed to permit the same corporation and its employees to engage in civil rights violations*.

*Id.* (emphasis added). Because the Tenth Circuit has to date declined to extend the intracorporate conspiracy doctrine in a civil rights case, this Court will similarly decline to extend it at this time.

### D. Dismissal of Official Capacity Claims

Plaintiff sued all of the individual defendants in their individual and official capacities. (Complaint, Doc. 2). The official capacity claims are considered to be claims for municipal liability and are thus one and the same as suing the City of Tulsa. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (an official capacity "suit is, in all respects other than name, to be treated as a suit against the entity"); *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998). "There is no longer a need to bring official-capacity actions against local government officials [because] local government units can be sued directly." *Graham*, 473 U.S. at 167, n.14.

Because the City is a party, the official capacity claims against the individual defendants are duplicative and unnecessary and should be dismissed. *See, e.g., Moore v. Bd. of County*

12

*Comm'rs of County of Leavenworth*, 470 F. Supp. 2d 1237, 1255 (D. Kan. 2007), *aff'd*, 507 F.3d 1257 (10th Cir. 2007) (dismissing redundant claims against individuals sued in official capacity where the county board was also sued); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (affirming directed verdict for city officials on official capacity claims where city was a defendant); *Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (affirming dismissal of official capacity suit against sheriff where the local government entity was a defendant); *Stewart v. City of Prairie Village, Kan.*, 904 F. Supp. 2d 1143, 1161 (D. Kan. 2012) (dismissing official capacity claims against officials where city was also named a defendant); *Leonard v. City of Tulsa*, No. 13-CV-256-CVE, 2013 WL 3216078, *4 (N.D. Okla. June 24, 2013) (dismissing duplicative claims against Chief of Police).

Plaintiff's official capacity claims against Henderson, Yelton, and Palmer are accordingly dismissed.

### E. Collective References to "Defendants"

The City and Palmer argue that the Complaint should be dismissed because plaintiff collectively refers to all of the defendants in parts of the Complaint and therefore does not provide sufficient notice to the defendants of what is alleged. (Doc. 16 at 11). The Complaint does include specific allegations with respect to conduct by each of the individual defendants and it clearly provides notice of the conduct of which plaintiff complains. (*See, e.g.,* "I. Background," in which the Court summarizes the factual allegations and claims asserted by plaintiff in the Complaint). The Court considers the allegations sufficient to state a plausible claim at this stage of the litigation.

## F. Statutory Wrongful Conviction Claim

Plaintiff's Fourth Cause of Action is a claim against the City for wrongful conviction, under *Okla. Stat.* tit. 51, § 154(B)(2)(e)(2). (Complaint, ¶¶ 79-87). Section 154(B) provides a claim for "wrongful criminal felony conviction resulting in imprisonment if the claimant ... has been granted judicial relief absolving the claimant of guilt on the basis of actual innocence of the crime for which the claimant was sentenced." *Okla. Stat.* tit. 51, § 154(B)(1). Under the statute, "for a claimant to recover based on 'actual innocence,' the individual must meet the following criteria: ... in the case of judicial relief, a court of competent jurisdiction found by clear and convincing evidence that the offense for which the individual was convicted, sentenced and imprisoned, including any lesser included offenses, was not committed by the individual and issued an order vacating, dismissing or reversing the conviction and sentence and providing that no further proceedings can be or will be held against the individual on any facts and circumstances alleged in the proceedings which had resulted in the conviction." *Id.*, § 154(B)(2)(e)(2).

The City argues that plaintiff's wrongful conviction claim should be dismissed because "[n]o such finding was made by the judge or alleged by the Plaintiff and therefore no claim for wrongful conviction can be maintained pursuant to Oklahoma law." (Doc. 16 at 13). In response, plaintiff notes that he has specifically alleged his factual innocence (*see* Doc. 2 at ¶ 85), and the filings by which Judge Kern granted the plaintiff the relief which resulted in his immediate release from imprisonment are filed under seal, such that it is inappropriate to dismiss plaintiff's Complaint for failure to allege or determine the basis for Judge Kern's ruling at this time.

14

After the parties completed briefing on this issue, the Oklahoma Supreme Court issued a decision which discussed the requirement of a finding of actual innocence under the wrongful conviction statute. *Courtney v. State*, 307 P.3d 337, 340 (Okla. 2013). "The term actual innocence is a general expression of Legislative intent to limit tort claim relief to cases in which the defendant was exonerated, as opposed to cases in which a conviction is set aside for the suppression of a confession or the exclusion of other evidence." *Id.* "Even though the determination of actual innocence is to be made in conjunction with a post-conviction relief proceeding, actual innocence is *not* an issue that must be determined for the court to grant post-conviction relief. Actual innocence is an ancillary issue to be determined in a supplemental proceeding." *Id.* The court noted that the determination of actual innocence is "just the first step in the tort claim process that may ultimately require a jury to finally determine a claimant's actual innocence." *Id.* at 341. The court stated that it "do[es] not believe that the Legislature intended the court to make a final adjudication of actual innocence at this stage. When viewed in the context of the larger tort claims process, it appears the Legislature intended the court to act as gatekeeper." *Id.* "The gatekeeper role of the court is to determine whether the petitioner had made a prima facie case of innocence," which "at this stage is not a burden of proof, but is the measure of the prima facie case." *Id.* The evidence must be viewed in the light most favorable to the petitioner, because, once a conviction is vacated, "the presumption of innocence is restored to the petitioner." *Id.* In doubtful cases, actual innocence "may ultimately be determined by a jury." *Id.* at 341-42.

Under the facts presented by plaintiff's Complaint, including his specific allegation of actual innocence, the Court concludes that dismissal of plaintiff's claim at this juncture would be premature. The Oklahoma Supreme Court indicated in *Courtney* that a judicial determination of

15

actual innocence may be made in an ancillary proceeding after the initial vacation of the conviction and that, in any event, actual innocence may ultimately be an issue for the jury. At this point, the Court will take the plaintiff's allegation of actual innocence as true, the presumption of innocence having been restored, and permit plaintiff's claim to proceed.

### G. Punitive Damages Claim against Palmer

Plaintiff seeks punitive and exemplary damages against Palmer, in his individual capacity. Palmer argues that the claim should be dismissed because plaintiff has not alleged facts supporting a finding of punitive damages. Plaintiff has alleged sufficient facts against Palmer at this time, and dismissal of the claim for punitive damages would be premature before the Court has before it a record that has been developed.

## IV. Conclusion

The Motion to Dismiss filed by the City and Ronald Palmer (Doc. 16) is **granted in part and denied in part**. The plaintiff's claim for unlawful arrest under the Fourth Amendment (the First Cause of Action) is time-barred and is therefore **dismissed**. The claims against defendants Henderson, Yelton, and Palmer, in their *official capacities*, are **dismissed** as redundant of the municipal liability claim against the City.[2] The dismissal motion is **denied** as to all other claims set forth in the Complaint.

The parties shall submit a Joint Status Report by **August 29, 2014**.

SO ORDERED this 15th day of August, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[2] While Henderson and Yelton did not move to dismiss, dismissal of all official capacity claims is appropriate, on the City's motion, because those claims are claims against the City. The official capacity claims against Henderson and Yelton are thus included in the dismissal.